UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JENNIFER HERNANDEZ, MA DE LOS ANGELES  :
SAUCEDO, DORIAN HERNANDEZ,                        :
ANGEL DUARTE, and ALDO YANEZ,               :
                                                                           :
                                                                           :
                                        Plaintiffs,                  :
                                                                           :
                    -against-                                        :          **COMPLAINT**
                                                                           :
MEX TEX CORP. d/b/a TACOS CALIFORNIA,    :
CAFÉ RODEO INC. d/b/a JALAPEÑOS MEXICAN  :
GRILL RESTAURANT, TEX MEX II INC. d/b/a      :
TACOS MATAMOROS RESTAURANT,                 :
and ARMANDO MUNOZ,                                    :
                                                                           :
                                        Defendants.                 :
------------------------------------------------------------------X

Plaintiffs Jennifer Hernandez, Ma de Los Angeles, Dorian Hernandez, Angel Duarte, and Aldo Yanez (together, "Plaintiffs"), by their attorneys Pechman Law Group PLLC, complaining of Defendants Mex Tex Corp. d/b/a Tacos California ("Tacos California"), Café Rodeo Inc. d/b/a Jalapeños Mexican Grill Restaurant ("Jalapeños"), Tex Mex II Inc. d/b/a Tacos Matamoros Restaurant, and Armando Munoz (collectively, "Defendants"), allege:

## NATURE OF THE ACTION

1.      This action is brought to recover unpaid minimum wages and overtime wages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and New York Labor Law § 190, *et seq.* ("NYLL").  This action is also brought to recover other monies as required by the NYLL.

2.      Defendants own and operate four popular Mexican restaurants, Tacos Matamoros, Jalapenos, Tacos California and La Cocina, in Brooklyn, New York.

3.      Plaintiffs worked as wait-staff at Tacos Matamoros, Jalapenos, and Tacos California, and were not compensated at the statutory minimum and overtime wage rates or furnished with statutorily required wage notices and weekly wage statements.

4.      Plaintiffs seek compensation for unpaid minimum wages, overtime wages, unpaid spread-of-hours pay, misappropriated gratuities, unlawful deductions, liquidated damages, pre- and post-judgment interest, and attorney's fees and costs pursuant to the FLSA and NYLL.

## JURISDICTION

5.      This Court has subject matter jurisdiction of this case pursuant to 29 U.S.C. § 216(b), 28 U.S.C. § 1331 and 28 U.S.C. § 1337, and has supplemental jurisdiction over Plaintiffs' claims under the NYLL pursuant to 28 U.S.C. § 1367.

## VENUE

6.      Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391, because all events relevant to this action occurred at Tacos California, Jalapeños, and Tacos Matamoros, which are all located and operated by Defendants in the Eastern District of New York.

## THE PARTIES

**Plaintiffs**

7.      Jennifer Hernandez resides in Brooklyn, New York.

8.      Jennifer Hernandez was employed by Defendants as a server and cashier from in or about May 30, 2016 to September 11, 2017.

9.      Ma de los Angeles Saucedo ("Saucedo") resides in Brooklyn, New York.

10.      Saucedo was employed by Defendants as a server and cashier from in or about October 2010 to in or around April 2016, again from May 2016 through in or

about October 2017, and then again from in or around January 2018 through May 19, 2018.

11.     Dorian Hernandez resides in Brooklyn, New York.

12.     Hernandez was employed by Defendants as a server, cashier, runner, or supervisor from in or about 2015 to in or about the middle of 2016, and then again from in or about October 2016 through September 2017.

13.     Angel Duarte ("Duarte") resides in Brooklyn, New York.

14.     Duarte was employed by Defendants as a server, runner, cashier, or supervisor from in or about May 23, 2016 through in or about June 2017.

15.     Aldo Yanez ("Yanez") resides in Brooklyn, New York.

16.     Yanez has been employed by Defendants as a server, runner, or manager from in or about May 23, 2016 through in or about March 21, 2018.

**Defendants**

17.     Defendants are part of a single, integrated enterprise that has jointly employed Plaintiffs at various periods, including within the last three years.

18.     The operations of Tacos California, Tacos Matamoros, and Jalapeños (collectively, the "Restaurants") are interrelated and unified.

19.     Defendants have applied the same employment policies, practices and procedures at the Restaurants.

20.     The Restaurants have been centrally controlled and/or owned by Defendants.

21.     Throughout Plaintiffs' employment with Defendants, Armando Munoz ("Munoz") was an owner, principal, and/or manager of the Restaurants.

22.     Munoz is named as "Principal" of Jalapeños on its liquor license as it appears on the New York State Liquor Authority's online database.

23.     Munoz is named as "Principal" of Tacos Matamoros on its liquor license as it appears on the New York State Liquor Authority's online database.

24.     During Plaintiffs' employment, Defendants have centrally controlled the employee relations of The Restaurants.

25.     During Plaintiffs' employment, Defendants have shared common management.

26.     In or about January 2014, Munoz hired Yanez to work as a general manager supervising the Restaurants.

27.     During Plaintiffs' employment, Defendants have directed and allowed employees to transfer or be shared by and between the Restaurants without retraining depending on the needs of the Restaurants.  For example, in or around July 2016, Munoz ordered that Angel Duarte, a Jalapeños employee, be transferred to work at Tacos California.  Then in or around September 2016, Munoz ordered that Duarte be transferred back to Jalapeños because Jalapeños was low on staffing.

28.     Employees of the Restaurants were also regularly transferred if one of the Restaurants was temporarily closed. For example, during the relevant period, Tacos Matamoros was closed by the New York State Department of Health approximately three times for approximately three to four days each time.  On these occasions, the employees of Tacos Matamoros were dispersed to either Jalapeños or Tacos California. For example, when Tacos Matamoros was closed by the New York State Department of Health, Ma de Los Angeles Saucedo was directed to work at Tacos California twice and at Jalapenos once.

29.     There is common purchasing for the Restaurants.

30.     The Restaurants regularly shared merchandise.  For example, the margarita mix was regularly made at Tacos Matamoros and then sent to the other

4

Restaurants.  Similarly, if one of the Restaurants ran low on an ingredient or item, the employee working as cashier or a manager would contact one of the other Restaurants, usually Tacos Matamoros because it is the largest of the Restaurants, and arrange for the item, such as rice, prepared mole sauce, or cups and napkins, to be brought to one of the Restaurants.

31.     The Restaurants share a substantially similar menu, both in design and food offerings.

32.     Each of the Restaurants' menus offers substantially similar breakfast and dinner options, often with identical descriptions of the food, and each of the Restaurants uses the same photographs of its dishes on its menu.

**Defendant Mex Tex Corp.**

33.     Defendant Mex Tex Corp. is a New York corporation that, at all times relevant to this action, owned and operated the restaurant Tacos California located at 4616 5th Avenue, Brooklyn, New York, 11220.

34.     Throughout Plaintiffs' employment, Tacos California has had employees engaged in interstate commerce or in the production of goods for interstate commerce and handling, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce by any person.

35.     In the three years preceding the filing of this Complaint, Tacos California had an annual gross volume of sales in excess of $500,000.

36.     Tacos California is, and was at all times relevant to this action, an "enterprise engaged in interstate commerce" within the meaning of the FLSA.

**Defendant Café Rodeo Inc.**

37.     Defendant Café Rodeo. Inc. is a New York corporation that owns and operates the restaurant Jalapeños Mexican Grill Restaurant located at 5714 5th Avenue, Brooklyn, New York 11220.

38.     Throughout Plaintiffs' employment, Jalapeños has had employees engaged in interstate commerce or in the production of goods for interstate commerce and handling, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce by any person.

39.     In the three years preceding the filing of this Complaint, Jalapeños had an annual gross volume of sales in excess of $500,000.

40.     Jalapeños is, and was at all times relevant to this action, an "enterprise engaged in interstate commerce" within the meaning of the FLSA.

**Defendant Tex Mex II Inc.**

41.     Defendant Tex Mex II Inc. is a New York corporation that owns and operates the restaurant Tacos Matamoros located at 4508 5th Avenue, Brooklyn, New York 11220.

42.     Throughout Plaintiffs' employment, Tacos Matamoros has had employees engaged in interstate commerce or in the production of goods for interstate commerce and handling, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce by any person.

43.     In the three years preceding the filing of this Complaint, Tacos Matamoros had an annual gross volume of sales in excess of $500,000.

44.     Tacos Matamoros was at all times relevant to this action an "enterprise engaged in interstate commerce" within the meaning of the FLSA.

6

**Defendant Armando Munoz**

45.     At all relevant times, Munoz has been an owner and/or manager of the Restaurants.

46.     At all relevant times, Munoz had and exercised the power and authority to fire and hire employees of the Restaurants, determine their method of pay, and dictate all other terms of employment.

47.     At all relevant times, Munoz has had power over payroll decisions at the Restaurants, including the power to retain time and/or wage records.

48.     At all relevant times, Munoz has had the power to close, shut down, and/or sell the Restaurants.

49.     Munoz was involved in creating the payroll policies that are the subject of this lawsuit.

50.     At all relevant times, Munoz has had the power to enter into contracts on behalf of the Restaurants, including the lease of each of the Restaurants.

51.     Munoz determined the design of the Restaurants.

52.     Munoz determined the menu of the Restaurants.

53.     Munoz approves the inventory orders for each of the Restaurants.

54.     Munoz interviewed, hired, and fired employees of the Restaurants.

55.     Munoz hired, and terminated, Aldo Yanez.

56.     Munoz was regularly present at Tacos Matamoros overseeing employees' work and making day to day decisions for the business.

57.     Munoz maintained an office at Jalapenos and Tacos California and visited these locations.

58.     Munoz conducted employee meetings at the Restaurants.  The meetings covered topics such as the sales of that Restaurant, customer service, and customer complaints.

59.     Employees of the Restaurant would raise issues with their pay directly with Munoz.  For example, at a meeting at Tacos Matamoros, employees complained that their wages were often not paid on time.  Munoz responded that the business was slow at the time and that their wages would be paid on time going forward.

60.     Munoz regularly approved employees' schedules at the Restaurants.

61.     Employees were directed to speak with Munoz, or Yanez when he worked as general manager, regarding changes to the schedule.  For example, the Taco Matamoros schedule for the week ending April 1, 2018 states that if employees have any questions to speak directly with Munoz.

62.     Munoz determined employees' wages.

63.     Munoz had video cameras installed at the Restaurants, and he would regularly monitor video camera footage of the Restaurants.  He would regularly call the Restaurants directly and speak with the employees to address any issues that he observed.

64.     Munoz exercised sufficient control over the Restaurants' operations and Plaintiffs' employment to be considered Plaintiffs' employer under the FLSA and NYLL.

## FACTUAL ALLEGATIONS

### Jennifer Hernandez's Hours Worked and Pay

65.     In approximately June 2016, when Jennifer Hernandez was hired to work as a server at Jalapeños, Defendants required her to train at Jalapeños for one day, from approximately 12:00 p.m. to 5:00 p.m.

66.     Defendants did not pay Jennifer Hernandez any wages for the day she was required to train at Jalapeños, and she did not receive tips from customers.

67.     For approximately the first two weeks of June 2016, Jennifer Hernandez worked as a server four days a week, from approximately 11:00 a.m. or 12:00 p.m. to 10:00 p.m., with a forty-five-minute daily break, for approximately thirty-seven to forty-one hours per week.

68.     From approximately the last two weeks of June 2016 until approximately September 2016, Jennifer Hernandez worked a regular schedule of six days per week as a server for between approximately forty-five hours and thirty minutes (45:30) and forty-six hours and thirty minutes (46:30). During this period, she regularly worked the dinner shift that started at 5:00 p.m. and ended between 1:00 a.m. and 2:00 a.m., depending on the day of the week. From Monday through Thursday, the shift ended at approximately 1:00 a.m., and Friday through Sunday the shift ended at approximately 2:00 a.m. She regularly took a forty-five minute break each day.

69.     From approximately September 2016 through the end of her employment in September 2017, Jennifer Hernandez worked a regular schedule of five days per week as a server from 5:00 p.m. until 1:00 a.m. or 2:00 a.m., depending on the day of the week, with a forty-five minute daily break, for between approximately thirty-seven hours and fifteen minutes (36:15) and thirty-nine hours and fifteen minutes (39:15).

70.     Throughout Jennifer Hernandez's employment, approximately once every four weeks she was assigned to work as a cashier on a Sunday.

71.     The Sunday cashier shift was assigned to the servers on a rotating basis so that a server would work the cashier position approximately once every four weeks.

72.     The cashier shift was from approximately 1:00 p.m. to 1:30 a.m.

73.    Throughout her employment, when Jennifer Hernandez worked as a server, Defendants paid her $7.50 for each hour worked.

74.    Throughout her employment, when Jennifer Hernandez worked as a cashier, Defendants paid her $11.00 for each hour worked.

75.    Defendants required Jennifer Hernandez to pay for customer walkouts on two occasions.

76.    Defendants did not notify Jennifer Hernandez of their intention to apply a tip credit to her wages, and therefore Defendants were not permitted to pay her at a reduced minimum wage rate.

77.    Defendants did not pay Jennifer Hernandez at the rate of one and one-half times her hourly wage rate for hours worked in excess of forty per workweek.

78.    Defendants did not compensate Jennifer Hernandez with one hour's pay at the minimum hourly wage rate for each day her shift exceeded ten hours.

79.    Defendants paid Jennifer Hernandez her wages in cash, without accompanying accurate wage statements accurately reflecting, *inter alia,* her regular and overtime hourly rates of pay and hours worked.

80.    Defendants did not furnish Jennifer Hernandez with wage notices at the time of her hiring or whenever there was a change in her wage rate.

**Ma de Los Angeles Saucedo**

81.    In approximately October 2010, Ma de Los Angeles Saucedo began to work as a server and cashier at Tacos Matamoros.

82.    From the start of her employment until approximately 2014, Saucedo regularly worked six days per week, five days as a server and one day as a cashier. During this time period, Saucedo regularly worked as a server on three week-days from either approximately 9:00 a.m. to 5:00 p.m. or from approximately 5:00 p.m. to

2:00 a.m., and on Saturday and Sundays from either 9:00 a.m. to 9:00 p.m. or from approximately 2:00 p.m. to 2:00 a.m.  Saucedo also worked one shift during the week as a cashier, from approximately 1:00 p.m. to 1:00 a.m. During this period Saucedo regularly worked between approximately sixty and sixty-three hours per workweek.

83.     From the start of her employment until 2014, Defendants paid Saucedo $20.00 per shift that she worked as a server, and $80 per shift that she worked as a cashier.

84.     In or about 2014 through in or about April 2018, Saucedo regularly worked five days per week, from 9:30 a.m. until 5:00 p.m., or from 5:00 p.m. until 2:00 a.m., with a daily break of forty-five minutes. During this period, Saucedo regularly worked approximately between thirty-three hours and forty-five minutes (33:45) and forty-one hours and fifteen minutes (41:15) per workweek.

85.     In or about May 2018, Saucedo worked three days per week as a server, from either approximately 9:30 a.m. until 5:00 p.m., or from approximately 5:00 p.m. until 2:00 a.m., with a daily break of forty-five minutes.  During this period, Saucedo regularly worked approximately twenty hours and fifteen minutes (20:15) and twenty-four hours and forty-five minutes (24:45) per workweek.

86.     From approximately 2014 through December 2017, Defendants paid Saucedo $7.50 per hour that she worked as a server including those hours worked above forty in a workweek.

87.     From in or about January 2018 through the end of her employment in May 2018, Defendants paid Saucedo $8.65 per hour that she worked as a server.

88.     In 2014, Defendants paid Saucedo $8.00 per hour that she worked as a cashier.

89.     In 2015, Defendants paid Saucedo $8.75 per hour that she worked as a cashier.

90.     In 2016, Defendants paid Saucedo $9.00 per hour that she worked as a cashier.

91.     In 2017, Defendants paid Saucedo $11.00 per hour that she worked as a cashier.

92.     In 2018, Defendants paid Saucedo $13.00 per hour that she worked as a cashier.

93.     Defendants required Saucedo to pay for customer walkouts on at least four occasions from 2012 to 2014.

94.     Defendants did not notify Saucedo of their intention to apply a tip credit to her wages, and therefore Defendants were not permitted to pay her at the reduced minimum wage rate.

95.     Defendants did not pay Saucedo at the rate of one and one-half times her hourly wage rate for hours worked in excess of forty per workweek.

96.     Defendants did not compensate Saucedo with one hour's pay at the basic minimum hourly wage rate for each day her shift exceeded ten hours.

97.     Defendants paid Saucedo her wages in cash, without accompanying accurate wage statements accurately reflecting, *inter alia*, her regular and overtime hourly rates of pay and hours worked.

98.     Defendants did not furnish Saucedo with wage notices at the time of her hiring or whenever there was a change in her wage rate.

**Dorian Hernandez**

99.    In or about 2015, when Dorian Hernandez was hired to work as a server at Tacos California, Defendants required her to train at Tacos California for one day, from approximately 4:00 p.m. to 11:00 p.m.

100.    From in or around 2015 through in or around March 2016, Dorian Hernandez worked at Tacos California as a server four to five days per week from 4:00 p.m. to 11:00 p.m., and two days per week as cashier from 11:00 a.m. until 12:00 a.m., with a daily lunch break of approximately thirty minutes, totaling between approximately fifty-one hours (51) to fifty-seven hours and thirty minutes (57:30) per workweek.

101.    From in or April 2016 until in or around June 2016, Defendants directed Dorian Hernandez to work as a supervisor at Tacos California.  As a supervisor, Hernandez worked six days per week, four days from 4:00 p.m. to 11:00 p.m., and two days from 12:00 p.m. to 12:00 a.m., for approximately forty-nine (49) hours per workweek.

102.    In or about June 2016, Defendants terminated Dorian Hernandez from Tacos California, and in or about October 2016, Defendants re-hired her to work at Jalapeños as a server, runner, and cashier.

103.    From October 2016 through September 2017, Dorian Hernandez worked six days per week, regularly working as a cashier two days per week from 5:00 p.m. to 12:00 a.m., one day as a runner from 7:00 a.m. to 12:00 p.m., and three days as a server from 5:00 p.m. to 12:00 a.m., with a daily thirty-minute break, for approximately thirty-seven (37) hours per workweek.

104.    Throughout Dorian Hernandez's employment at Tacos California, Defendants paid her approximately $35.00 per shift as a server, and $115.00 per shift as a cashier.

105.    From in or about April 2016 through in or about June 2016, Defendants paid Dorian Hernandez a weekly salary of $500 for weeks that she worked as a supervisor.

106.    Throughout Dorian Hernandez's employment at Jalapeños, Defendants paid her $7.50 per hour she worked as a server and runner, and $11.00 per hour she worked as a cashier.

107.    Defendants required Dorian Hernandez to pay for customer walkouts on at least four occasions.

108.    Defendants did not pay Dorian Hernandez the statutorily required minimum wage.

109.    Defendants did not notify Dorian Hernandez of their intention to apply a tip credit to her wages, and therefore Defendants were not permitted to pay her at the reduced minimum wage rate.

110.    Defendants failed to pay Dorian Hernandez a weekly salary of at least $675.00 to qualify for the New York State executive employee exemption to overtime pay when she worked as a supervisor at Tacos California.

111.    Defendants did not pay Dorian Hernandez at the rate of one and one-half times her hourly wage rate for hours worked in excess of forty per workweek.

112.    Defendants did not compensate Dorian Hernandez with one hour's pay at the statutory minimum hourly wage rate for each day her shift exceeded ten hours.

113.    Defendants paid Dorian Hernandez her wages in cash, without accompanying accurate wage statements accurately reflecting, *inter alia,* her regular and overtime hourly rates of pay and hours worked.

114.    Defendants did not furnish Dorian Hernandez with wage notices upon hire or whenever there was a change in her wage rate.

**Angel Duarte**

115.    In approximately May 2016, when Duarte was hired to work as a server at Jalapeños, Defendants required him to train for approximately two days.

116.    During his approximately two-day training period, Duarte worked from approximately 5:00 p.m. until 12:00 a.m. or 1:00 a.m.

117.    Defendants did not pay Duarte any wages for the days he was required to train at Jalapeños.

118.    Upon completion of his training, and through in or about June 2016, Duarte regularly worked as a server at Jalapeños, five days per week, from 5:00 p.m. to 1:00 a.m., with a daily break of forty-five minutes, for approximately thirty-six hours and fifteen minutes (36:15).

119.    From in or around July 2016 until September 5, 2016, Duarte worked at Tacos California as a supervisor.

120.    In or around September 5, 2016, Duarte returned to work as a cashier, runner, and server at Jalapeños.

121.    From September 5, 2016 through the end of his employment on June 19, 2017, Duarte worked five days per week, two days as a runner from approximately 12:00 p.m. to 10:00 p.m., one day as a cashier from approximately 1:00 p.m. to 1:30 a.m., and two days as a server working either from approximately 9:00 a.m. to 5:00 p.m., or

approximately 5:00 p.m. to 1:00 a.m., with a daily break of forty-five minutes, for approximately forty-four hours and twenty minutes (44:20) per workweek.

122.    Throughout Angel Duarte's employment, approximately once every four weeks, he worked as a cashier on a Sunday from 1:00 p.m. to 1:30 a.m.

123.    Throughout his employment when Duarte worked as a server or runner at Jalapeños, Defendants paid him $7.50 for each hour worked.

124.    Throughout his employment when Duarte worked as a cashier at Jalapeños, Defendants paid him $11.00 for each hour worked.

125.    Defendants did not notify Duarte of their intention to apply a tip credit to his wages, and therefore Defendants were not permitted to pay him at the reduced minimum wage rate.

126.    Defendants did not pay Duarte at the rate of one and one-half times his regular wage rate for hours worked in excess of forty per workweek.

127.    Defendants did not compensate Duarte with one hour's pay at the basic minimum hourly wage rate for each day his shift exceeded ten hours.

128.    Defendants paid Duarte his wages in cash, without accompanying accurate wage statements accurately reflecting, *inter alia*, Duarte's regular and overtime hourly rates of pay and hours worked.

129.    Defendants did not furnish Duarte with wage notices at the time of his hiring or whenever there was a change in his wage rate.

**Aldo Yanez**

130.    From in or around May 2012 through in or around December 2013, Yanez worked six days per week as a server and runner for between approximately fifty-nine hours (59) and sixty-two hours (62) per workweek.

131. From in or around May 2012 through in or around December 2013, Yanez worked as a runner three days per week, on Saturday and Sunday from approximately 12:00 p.m. to 1:00 a.m., and Friday from approximately 5:00 p.m. to 2:00 a.m., and as a server three days per week, from either 9:00 a.m. to 5:00 p.m. or 5:00 p.m. to 2:00 a.m.

132. In or around January 2014, Defendants promoted Yanez to work as a general manager supervising the Restaurants.

133. From in or around May 2012 to in or about December 2013, when Yanez worked as a server at Tacos Matamoros, Defendants paid him a fixed shift rate of $20.00.

134. From in or around May 2012 until in or about December 2012, Defendants paid Yanez $11.00 per hour for all hours worked as a runner. In or around December 2012, Defendants increased Yanez's pay to $11.50 per hour for all hours worked as a runner, and in May 2013, Defendants increased Yanez's pay to $12.00 per hour for all hours worked as a runner.

135. Yanez was not permitted to retain his share of the tip pool when he worked as a runner. Instead, the servers put his share of the tip pool, which was $25.00 per server, in an envelope and left it for Defendant Munoz in the office.

136. Defendants did not pay Yanez at the rate of one and one-half times his regular wage rate for hours worked in excess of forty per workweek.

137. Defendants did not compensate Yanez with one hour's pay at the minimum hourly wage rate for each day his shift exceeded ten hours.

138. Defendants paid Yanez his wages in cash, without accompanying accurate wage statements accurately reflecting, *inter alia*, Yanez's regular and overtime hourly rates of pay and hours worked.

139.     Defendants did not furnish Yanez with wage notices at the time of his hiring or when he was promoted to general manager and his wage rate changed.

## MISAPPROPRIATION OF GRATUITIES BY DEFENDANTS

140.     Defendants established and imposed an unlawful tip pool upon Plaintiffs and the other wait staff at Tacos Matamoros and Jalapeños that required them to pay a share of their gratuities to Defendant Munoz.

141.     Throughout their employment at Taco Matamoros, while working as servers, Plaintiffs Yanez and Suacedo were required to give fifteen percent of their daily gratuities to Defendant Munoz.

142.     At the end of each shift, the waitstaff at Tacos Matamoros were required to set aside fifteen percent of the tips left by customers and put it in an envelope in the office of the restaurant.  For example, the envelope for the week of May 8 to May 14, 2017 contained $919.00 in gratuities.

143.     The waitstaff were instructed to write "Bartender's" on the outside of the envelope, however, upon information and belief, this money was retained by Munoz and not paid to the bartenders.

144.     Similarly, at Jalapeños, the waitstaff, including Dorian Hernandez, Duarte, and Jennifer Hernandez were required to give ten percent of their gratuities to Defendant Munoz.

145.     At the end of each shift, the waitstaff at Jalapeños were required to set aside ten percent of the tips left by customers, and put it in an envelope marked "Bartender's" in the office of the restaurant for Defendant Munoz.  Upon information and belief, this money was retained by Munoz and not paid to the bartenders.

## FIRST CLAIM
### (FLSA – Unpaid Minimum Wages)

146.   Plaintiffs repeat and re-allege all foregoing paragraphs as if fully set forth herein.

147.   Defendants are employers within the meaning of 29 U.S.C. §§ 203(e) and 206(a) and employed Plaintiffs.

148.   Plaintiffs were employees within the meaning of the FLSA.

149.   The FLSA requires that employers pay employees at least the minimum wage for each hour worked up to forty in one week.

150.   Defendants were not eligible to avail themselves of the federal tipped minimum wage rate under the FLSA because, *inter alia*:

   a.   Defendants were required to, but failed to, inform Plaintiffs of the provisions of subsection 203(m) of the FLSA, 29 U.S.C. § 203(m); and

   b.   Plaintiffs were not permitted to retain the entirety of their gratuities.

151.   The minimum wage provisions set forth in the FLSA, 29 U.S.C. § 206, *et seq.*, and the supporting federal regulations, apply to Defendants.

152.   Defendants failed to pay Plaintiffs the minimum wages to which they are entitled under the FLSA.

153.   Defendants were aware or should have been aware that the practices described in this Complaint were unlawful and have not made a good faith effort to comply with the FLSA with respect to Plaintiffs' compensation.

154.   As a result of Defendants' willful violations of the FLSA's minimum wage provisions, Plaintiffs suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, pre- and post-judgment interest,

attorneys' fees and costs of this action, and other compensation pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM
### (NYLL – Unpaid Minimum Wages)

155.    Plaintiffs repeat and reallege all foregoing paragraphs as if fully set forth herein.

156.    Defendants are employers within the meaning of the NYLL §§ 190, 651(5), 652, and supporting New York State Department of Labor ("NYDOL") Regulations and employed Plaintiffs.

157.    The NYLL and its supporting regulations require that employers pay employees at least the minimum wage for each hour worked up to forty per workweek.

158.    The minimum wage provisions of Article 19 of the NYLL and the supporting NYDOL Regulations apply to Defendants.

159.    Defendants were not eligible to avail themselves of the tipped minimum wage rate under the NYLL because, *inter alia*:

       a.  Defendants were required to, but failed to, inform Plaintiffs of the tip credit provisions of the NYLL and the supporting NYDOL Regulations; and

       b.  Plaintiffs were not permitted to retain the entirety of their gratuities.

160.    Defendants failed to pay Plaintiffs the minimum wages to which they are entitled under the NYLL.

161.    Defendants have willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiffs minimum hourly wages.

162.   As a result of Defendants' violations of the NYLL, Plaintiffs are entitled to recover their unpaid wages, liquidated damages, reasonable attorneys' fees and costs of the action, and post-judgment interest.

### THIRD CLAIM
### (FLSA – Unpaid Overtime Wages)

163.   Plaintiffs repeat and reallege all foregoing paragraphs as if fully set forth herein.

164.   Defendants were required to pay Plaintiffs one and one-half times the regular rate at which Plaintiffs were employed, and which equaled at least the minimum wage, for all hours worked in excess of forty hours in a workweek pursuant to the overtime wage provisions set forth in the FLSA, 29 U.S.C. § 207, *et seq.*

165.   Defendants have failed to pay Plaintiffs the overtime wages to which they are entitled under the FLSA.

166.   Defendants have willfully violated the FLSA by knowingly and intentionally failing to pay Plaintiffs overtime wages.

167.   Due to Defendants' violations of the FLSA, Plaintiffs are entitled to recover their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre- and post-judgment interest.

### FOURTH CLAIM
### (NYLL – Unpaid Overtime Wages)

168.   Plaintiffs repeat and reallege all foregoing paragraphs as if fully set forth herein.

169.   Under the NYLL and supporting NYDOL Regulations, Defendants were required to pay Plaintiffs one and one-half times the regular rate of pay, which is equal to at least the minimum wage, for all hours they worked in excess of forty.

170.   Defendants failed to pay Plaintiffs the overtime wages to which they are entitled under the NYLL.

171.   Defendants have willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiffs overtime wages.

172.   Due to Defendants' willful violations of the NYLL, Plaintiffs are entitled to recover their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre- and post-judgment interest.

## FIFTH CLAIM
### (NYLL – Spread-of-Hours Pay)

173.   Plaintiffs repeat and reallege all foregoing paragraphs as if set forth herein.

174.   Defendants have willfully failed to pay Plaintiffs additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which Plaintiffs' shifts spread over more than ten hours.

175.   By Defendants' failure to pay Plaintiffs spread-of-hours pay, Defendants have willfully violated NYLL Article 19, §§ 650, *et seq.*, and the supporting NYDOL Regulations, including, but not limited to, 12 N.Y.C.R.R. § 146-1.6.

176.   Due to Defendants' willful violations of the NYLL, Plaintiffs are entitled to recover an amount prescribed by statute, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest, and liquidated damages.

## SIXTH CLAIM
### (New York Labor Law – Misappropriation of Gratuities)

177.   Plaintiff repeats and re-alleges all foregoing paragraphs as if fully set forth herein.

178.    Defendants unlawfully demanded or accepted, directly or indirectly, part of the gratuities received by Plaintiffs in violation of the NYLL, Article 6, § 196-d and the supporting NYDOL Regulations.

179.    Defendants required Plaintiffs to share a portion of the gratuities they received with employees other than bussers, servers, or similar employees, in violation of NYLL, Article 6, § 196-d and the supporting NYDOL Regulations.

180.    By Defendants' knowing or intentional demand for, acceptance of, and/or retention of a portion of the gratuities received by Plaintiffs, Defendants have willfully violated the NYLL, Article 6, § 196-d and the supporting NYDOL Regulations.

181.    Due to Defendants' willful violations of the NYLL, Plaintiffs are entitled to recover from Defendants their unpaid gratuities, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

## SEVENTH CLAIM
### (New York Labor Law – Unlawful Deductions)

182.    Plaintiffs repeat and reallege all foregoing paragraphs as if fully set forth herein.

183.    New York Labor Law § 193(1) prohibits employers from making any deductions from an employee's wages except for those permitted by law.

184.    Defendants made a charge against Plaintiffs' wages and/or required Plaintiffs to make payment by separate transaction to cover for non-payment of guest checks.

185.    Defendants' knowing and intentional deductions from the pay of the Plaintiffs or requirement that Plaintiffs pay by separate transaction is a willful violation of the NYLL and supporting Department of Labor Regulations.

186.    Due to Defendants' willful violations of the NYLL, Plaintiffs are entitled to recover from Defendants the amounts of any unlawful deductions and/or payments, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

### EIGHTH CLAIM
### (NYLL Wage Theft Prevention Act – Failure to Provide Wage Notices)

187.    Plaintiffs repeat and reallege all foregoing paragraphs as if fully set forth herein.

188.    The NYLL and the Wage Theft Prevention Act ("WTPA") require employers to provide all employees with a written notice of wage rates at the time of hire and whenever there is a change to an employee's rate of pay.

189.    In violation of NYLL § 195(1), Defendants failed to furnish Plaintiffs at the time of hiring, or whenever their rate of pay changed, with a wage notice containing the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with NYLL § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer, and anything otherwise required by law; in violation of the NYLL § 195(1).

190.    Due to Defendants' violation of NYLL § 195(1), Plaintiffs are entitled to recover from Defendants liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action, pursuant to the NYLL § 198(1-b).

**NINTH CLAIM**
**(NYLL Wage Theft Prevention Act – Failure to Provide Wage Statements)**

191.    Plaintiffs repeat and reallege all foregoing paragraphs as if fully set forth herein.

192.    The NYLL and WTPA also require employers to provide employees with an accurate wage statement each time they are paid.

193.    Defendants failed to furnish Plaintiffs with each payment of wages an accurate statement listing: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages; in violation of the NYLL § 195(3).

194.    Due to Defendants' violation of NYLL § 195(3), Plaintiffs are entitled to recover from Defendants liquidated damages, reasonable attorney's fees, and costs and disbursements of the action, pursuant to the NYLL § 198(1-d).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment:

a.      declaring that Defendants have violated the minimum and overtime wage provisions of the FLSA and the NYLL;

b.      declaring that Defendants have violated the spread-of-hours pay provision of the NYLL and the NYDOL Regulations;

c.      declaring that Defendants misappropriated gratuities in violation of the NYLL and the NYDOL Regulations;

   d. declaring that Defendants made improper deductions from wages in violation of the NYLL and the NYDOL Regulations;

   e. declaring that Defendants have violated the notice and wage statement provisions of the NYLL and WTPA;

   f. declaring that Defendants' violations of the FLSA and the NYLL were willful;

   g. enjoining future violations of the FLSA and the NYLL;

   h. awarding Plaintiffs unpaid minimum and overtime wages;

   i. awarding Plaintiffs unpaid spread-of-hours pay;

   j. awarding Plaintiffs misappropriated gratuities;

   k. awarding Plaintiffs reimbursement for unlawful deductions;

   l. awarding Plaintiffs liquidated damages in an amount equal to the total amount of the wages found to be due;

   m. awarding Plaintiffs statutory damages as a result of Defendants' failure to furnish accurate wage statements and wage notices pursuant to the NYLL;

   n. awarding Plaintiffs pre- and post-judgment interest under the FLSA and the NYLL;

   o. awarding Plaintiffs reasonable attorneys' fees and costs pursuant to the FLSA and the NYLL; and

       p.     awarding such other and further relief as the Court deems just and

proper.

Dated:    New York, New York
            October 31, 2018

PECHMAN LAW GROUP PLLC

By: _____
      Louis Pechman
      Vivianna Morales
      488 Madison Avenue, 17th Floor
      New York, New York 10022
      Tel.: (212) 583-9500
      pechman@pechmanlaw.com
      morales@pechmanlaw.com
      *Attorneys for Plaintiffs*